UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 14-369 (MJD)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AMINA MOHAMUD ESSE, )<br>)<br>Defendant. ) | **DEFENDANT'S POSITION AS TO SENTENCING FACTORS AND SENTENCING MEMORANDUM** |

In the post-*Booker* world and perhaps as a nod to the limitations of guideline sentencing as a whole, the sentencing judge's consideration of the appropriate sentence no longer ends after he has performed the various guideline adjustments to the base offense level, calculated the defendant's criminal history score, and located the point on the grid where the two calculations meet.  In the words of the Court in *Rita*, this "wholesale sentencing" has given way to the "retail" sentencing that is possible by a sentencing judge who has access to, and the accompanying discretion to consider, information regarding the individual defendant before the court and the facts of her case in arriving at an appropriate sentence.  In other words, the judge can now tailor the sentence to fit the offender and the offense before the court.  In this case, in particular, that discretion is informed by this Court's institutional experience with cases involving terrorism as well as other cases within the District involving similarly situated defendants.

Amidst this changed sentencing landscape, appears before this Court, Amina Esse, who by and through the undersigned counsel, provides the following Position as to

PDF created with pdfFactory trial version www.pdffactory.com

Sentencing Factors and Sentencing Memorandum.  For the reasons set forth below, the defendant respectfully submits that a sentence of 3 years of probation is a sentence that is sufficient, but not greater than necessary to carry out the statutory purposes of sentencing.

## FACTUAL SUMMARY

**I.     MS. ESSE'S PERSONAL HISTORY**

Ms. Esse was born in 1974 in Somalia and lived there with her parents and her three siblings until she was 24 years old.  The family lived in a home provided by the government that only had three rooms.  Although there was running water and electricity, the electricity was inconsistent.  Ms. Esse's father was absent most of the time, and she and her siblings were essentially raised by her mother.

Life in Somalia was hard for Ms. Esse.  When she was about 7 years old, family members held her down so that others could perform genital mutilation on her.  Ms. Esse attended school in Somalia until the eighth grade.  She wanted to continue school, but her parents made her quit.  As the political situation in Somalia deteriorated even further, rapes of women were rampant.  When Ms. Esse was about 15 or 16 years old, she was raped by three men.  At age 15, Ms. Esse was forced to marry a man in an arranged marriage.  This marriage ended in 1993 or 1994.  While living in Somalia, Ms. Esse gave birth to her oldest daughter.

In 1999, Ms. Esse fled Somalia with her daughter to a refugee camp in Botswana.  While in the refugee camp, her daughter was sexually assaulted by a man in 2006, when she was 8 years old.  Ms. Esse reported the rape to the Botswana police.  The man fled Botswana to avoid arrest.  However, his family found Ms. Esse and severely beat her for

PDF created with pdfFactory trial version www.pdffactory.com

reporting the rape to the authorities.  While in the refugee camp, Ms. Esse gave birth to her second child, a daughter, in 2006.  She is currently 10 years old, and lives with her mother, sister and brother in Minneapolis.  She does not know her father and has no relationship with him.

In 2009, Ms. Esse traveled to the United States.  In 2011, she married Mohamed Ali.  The first night of their marriage, Mr. Ali grabbed Ms. Esse by the neck, pushed her up against the wall and threatened to physically hurt her, because she refused him sex.  Mr. Ali was very controlling.  He did not allow Ms. Esse to get a driver's license or to obtain gainful employment because he wanted to control her every move.  Mr. Ali worked in Nashville, Tennessee during the week, and came back to Minnesota on the weekend.  He told Ms. Esse that if she ever refused him anything, he would physically harm her, divorce her and not support her financially.  He was so controlling that he would even send Ms. Esse toilet paper from Nashville, rather than have her go to the store to buy supplies.  Ms. Esse and Mr. Ali were divorced in late 2012.  Ms. Esse had a son with Mr. Ali, born in March of 2013.  Her son is now 3 years old, and lives with his mother and two sisters in Minneapolis.  He does not know his father and has no contact with him.

After Ms. Esse's divorce from Mr. Ali, she has concentrated on supporting and raising her children.  Her children are ages 18, 10 and 3.  They live with Ms. Esse in Minneapolis.  She is their sole caretaker.  Their fathers are not involved in their lives.  She is gainfully employed as a personal care attendant for a Bloomington company taking care of two patients.  She makes $11.75 an hour.

PDF created with pdfFactory trial version www.pdffactory.com

**II.    FACTS RELATING TO THE CASE**

From December 28, 2011 through April 27, 2012, Ms. Esse sent or caused to be sent 6 payments to co-conspirators Fardowsa Jama Mohamed and Muna Osman Jama totaling $850 to support the terrorist group al-Shabaab.  This money was provided to her by her husband, Mohamed Ali, who was an al-Shabaab supporter.  Ms. Esse contacted Ms. Jama and Ms. Mohamed through on-line chat rooms at the direction of Mr. Ali.  Ms. Esse was initially told that the payments were to support orphans of the war.  The first two payments Ms. Esse believed were going to support orphans.  However, after the first two payments, she became suspicious, and confronted Ms. Jama.  Ms. Jama then told her that the payments were to support al-Shabaab.  Although Ms. Esse now knew the payments were to support al-Shabaab, she continued to send the payments at the direction of her husband.  Ms. Esse accepts full responsibility for her actions in supporting al-Shabaab, and knows what she did was wrong and criminal.

Ms. Esse started to question the merits of sending money to al-Shabaab, and after the last payment on April 27, 2012, she told Ms. Jama that she was no longer going to send anymore payments.  The government and the defense both agree that Ms. Esse terminated her relationship with Ms. Mohamed and Ms. Jama, and ended her involvement in the conspiracy before she had knowledge of the existence of the government's investigation into her misconduct.  Although Ms. Esse had a change of heart and ceased her involvement in the conspiracy, it was too late.  She had committed a crime.

PDF created with pdfFactory trial version www.pdffactory.com

### III.     MS. ESSE'S POST-CONSPIRACY CONDUCT

After Ms. Esse told Ms. Jama in the spring of 2012 that she was no longer going to send payments to support al-Shabaab, she was ostracized by supporters of al-Shabaab, including her husband.  Her husband stopped supporting Ms. Esse financially, and they were divorced at the end of 2012.  Ms. Esse was unemployed and did not know how she was going to support her family.  She tried to turn to members of the Somalia community for help, but no one would help her.  The government, aid groups and people in the Minneapolis community stepped up to help her support her family.  Ms. Esse was overwhelmed by the support she and her family received, and was ashamed of her previous support for al-Shabaab.

Although Ms. Esse had left the conspiracy and was truly remorseful for her actions, a government investigation was already underway into her and her co-conspirator's activities.  After FBI agents came to her residence in the summer of 2014, the undersigned was appointed to represent Ms. Esse.  Within a short period of time, Ms. Esse began cooperating with the government to assist in the investigation of her co-conspirators, who had been indicted in the Eastern District of Virginia with providing material support to al-Shabaab, and to also assist the government in other ongoing investigations.

On November 17, 2014, Ms. Esse pled guilty by information to one count of providing material support to a terrorist organization.  Prior to entering a plea, Ms. Esse met with government agents for a total of over 14 hours over 5 proffer sessions during the months of October and November of 2014.  After she pled guilty, she continued to

5

PDF created with pdfFactory trial version www.pdffactory.com

cooperate with the government.  During the ensuing months, she had 3 additional proffer sessions with the U.S. Attorney's Office in Minnesota and the Minnesota FBI agents, and 8 additional proffer sessions with government agents from the Eastern District of Virginia to prepare for her testimony in the trial of her co-conspirators.  Each of these proffer sessions lasted several hours, and together totaled almost 38 hours.

The above-stated proffer sessions were sessions that undersigned counsel attended with Ms. Esse.  In addition to these proffer sessions, Ms. Esse also met with Minneapolis based FBI agents to assist the government in other ongoing investigations.  The undersigned was not present for these meetings.  On information and belief, Ms. Esse attended approximately 60 additional meetings with Minneapolis FBI agents to assist in ongoing investigations.  It is expected that the government will outline in detail Ms. Esse's substantial assistance to the government both in the prosecution of her co-conspirators in the Eastern District of Virginia, and with other investigations in a separate letter to the Court in support of its expected 5k1.1 Motion for Downward Departure. The undersigned defense counsel may also submit a letter to supplement the government's letter, if necessary.

Ms. Esse testified for the government for over 6 hours over two days in July 2016 in a bench trial of two of her co-conspirators in the Eastern District of Virginia.  United States District Judge Anthony J. Trenga found the defendants guilty of conspiracy to provide material support to a terrorist organization and most of the underlying substantive counts.  *See*, *United States v. Muna Osman Jama, et al*, Case No. 1:14-cr-230-AJT (E.D. of Virginia).  Ms. Esse's testimony at the trial was consistent with her previous proffers,

6

PDF created with pdfFactory trial version www.pdffactory.com

was complete, and refuted the defendants' claim that any financial aid provided to al-Shabaab was for humanitarian medical aid.

## ARGUMENT AS TO THE APPROPRIATE SENTENCE

In *United States v. Booker*, 543 U.S. 220, 245-246 (2005), the United States Supreme Court held that mandatory application of the federal sentencing guidelines is unconstitutional, and that the guidelines should be viewed as merely advisory. Post-*Booker* cases in the United States Supreme Court and the Eighth Circuit Court of Appeals address the power and discretion of the district court in fashioning an appropriate sentence. When designing an appropriate sentence after *Booker*, a district court should begin with calculating the applicable advisory guideline range. *U.S. v. Gall*, 128 S.Ct. 586 (2007); *U.S. v. Maloney*, 466 F.3d 663, 667 (8th Cir. 2006). Thereafter, the district court must consider the individual circumstances of the defendant and the crime committed, and determine whether a variance from the applicable advisory guideline range is appropriate considering the mandate of 18 U.S.C. § 3553 that the district court impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing outlined in 18 U.S.C. § 3553. *Gall*, 128 S.Ct. at 13; *U.S. v. Thundershield*, 474 F.3d 503, 507 (8th Cir. 2007). Post *Booker*, the district courts have flexibility to deviate from the advisory sentencing guideline range to "individualize sentences where necessary," and to "tailor the sentence in light of the statutory concerns other than the advisory guidelines." *U.S. v. Maloney*, 466 F.3d 663, 668 (8th Cir. 2006).

A sentencing court must consider the following factors as set forth in 18 U.S.C. § 3553(a) in order to arrive at a sentence:

PDF created with pdfFactory trial version www.pdffactory.com

    (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need of the sentence imposed-
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most cost effective manner;
    (3) the kinds of sentences available;
    (4) the advisory guideline range;
    (5) any pertinent policy statements issued by the Sentencing Commission;
    (6) the need to avoid unwarranted sentence disparities; and
    (7) the need to provide restitution to any victims of the offense.

Upon consideration of these factors, the court then must impose a sentence that is sufficient, but no greater than necessary to satisfy the purposes of sentencing, to wit, "just punishment, deterrence, protection of the public and the rehabilitation of the defendant." *United States v. Lupton*, 2009 WL 1886007, *1, 4 (E.D. Wis). The sentencing judge's responsibility, then, has become to "canvass all of the many features of the case that bear on the culpability of the defendant." *See United States v. Ovid*, 2010 WL 3940724, *1, 6 (E.D. N.Y). Some of these features have been considered by the Sentencing Commission, some have not. Nonetheless, this court's consideration must be guided by the overarching explicitly stated command that the ultimate sentence imposed should be no greater than necessary to satisfy the statutory purposes of sentencing.

After consideration of all the relevant sentencing factors in this case, Ms. Esse respectfully suggests that a sentence of 3 years of probation is a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing.

PDF created with pdfFactory trial version www.pdffactory.com

**I.      SENTENCING GUIDELINES CALCULATION**

Ms. Esse previously objected to receiving a 2-level increase in the offense level for providing funds to the terrorist organization having reason to believe that such funds would be used to purchase dangerous weapons, pursuant to U.S.S.G. §2M5.3(b)(1)(D). Ms. Esse withdraws this objection. Therefore, Ms. Esse agrees with the guideline calculations contained in the PSR, namely, that her total offense level is 35, and her criminal history category is VI (Ms. Esse has no previous criminal convictions on her record, but the guidelines provide that a person convicted of a federal terrorism offense is deemed to be a criminal history VI, even if the defendant has no previous criminal convictions). Therefore, her applicable guideline range is the statutory maximum sentence of 15 years in prison.

**II.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND MS. ESSE'S VOLUNTARY WITHDRAWAL FROM THE CONSPIRACY SUPPORT A SENTENCE OF PROBATION**

Congress directs this Court to examine the nature and circumstances of the offense as one factor at arriving at a sentence that is sufficient, but not greater, than necessary to accomplish the purposes of sentencing. In examining the nature and circumstances of the offense, this Court must evaluate Ms. Esse's individual actions, not those of the conspiracy as a whole. *United States v. Warsame*, 651 F.Supp.2d 978, 981 (D. Minn. 2009)

In assessing Ms. Esse's conduct, several factors are noteworthy. First, Ms. Esse is guilty of providing material support to al-Shabaab because she provided a total of $850 in funds to support al-Shabaab in 6 payments over a four month period. She did not travel

PDF created with pdfFactory trial version www.pdffactory.com

to Somalia to fight for al-Shabaab, nor did she recruit others to do so. Moreover, the money she sent to al-Shabaab was provided to her by her husband, with instructions to send the money to Ms. Mohamed. Presumably this was done by Ms. Esse's husband to shield him from potential criminal prosecution because it would be difficult to trace the money to him. While Ms. Esse still committed the crime by knowingly sending payments to al-Shabaab, the fact that she was manipulated by her abusive husband, that she provided limited assistance to al-Shabaab over a short period of time, and that she did not recruit others to either fight for or materially support al-Shabaab mitigate her culpability.

Moreover, Ms. Esse voluntarily withdrew from the conspiracy, at great risk of retaliation by her husband and others in her community, *before* Ms. Esse knew of the government's investigation of her and her co-conspirators. After Ms. Esse learned that her payments were going to support al-Shabaab, not orphans, she started to have doubts about sending any additional payments to al-Shabaab, but continued to do so, at the direction of her husband. However, shortly after making the last payment on April 27, 2012, Ms. Esse told Ms. Jama and her husband that she was not going to send any more payments. Despite great pressure from her husband and Ms. Jama, Ms. Esse was firm and ended her involvement in the conspiracy, more than 2 years before FBI agents showed up at her door to execute a search warrant in the summer of 2014.

During this two year period from the time Ms. Esse ended her involvement in the conspiracy to the time the FBI agents came to her door, Ms. Esse remained law-abiding and concentrated on doing what was best for her and her children. She divorced her

PDF created with pdfFactory trial version www.pdffactory.com

abusive husband, who is the person that directed her to send money to al-Shabaab, even though he was the sole support for her and her children. She ended any contact with supporters of al-Shabaab, and concentrated on raising her three children.

Ms. Esse's change in her behavior was not motivated by improving her legal position; at the time she made the decision to change her life, she did not know she would ever have a legal position that would need to be improved. Rather, her actions were motivated by a genuine change of heart. She did not want to be under the thumb of her abusive husband, and did not want to have anything to do with al-Shabaab. She wanted to make a better life for her and her children. Not an insignificant number of federal judges have considered an individual's efforts at post-offense rehabilitation as grounds to impose a non-guideline sentence. Likewise, Ms. Esse's voluntary withdrawal from the criminal activity in which she was involved, although not amounting to a legal defense, support the sentence she seeks. Several cases provide legal support for defendant's position.

In *United States v. Shy*, the defendant Burton was convicted of possession of a methamphetamine precursor with knowledge it would be used to manufacture methamphetamine. *United States v. Shy*, 438 F.3d 933, 936-938 (8th Cir. 2008). Burton sought and was granted a variance under 18 U.S.C. § 3553(a) from an advisory guideline sentence of 37-46 months to three years of probation. *Shy*, 438 F.3d at 936-938. The district court relied in part on Burton's efforts to change her life and get help for her drug problem as justification for granting a variance and sentencing her to probation. *Id.* at 936. In this regard, the court noted that it "did not believe Burton would relapse into a

11

PDF created with pdfFactory trial version www.pdffactory.com

criminal lifestyle" and that a guideline sentence would not further the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). *Id.*

The Eighth Circuit affirmed the district court's sentence of probation noting that although Burton's rehabilitation came after her encounter with law enforcement, that it was nonetheless genuine. *Id* at 938. The court observed that although the district court varied from a prison sentence to one of probation that "offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Id* at 938, *quoting Gall v. United States*, 128 S.Ct. 586, 595 (2007). *See also United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008)(defendant's post-arrest rehabilitation and his extensive medical needs supported variance from an advisory guideline sentence of 60 months in prison provided by statute to a sentence of three years of probation).

*Gall v. United States* provides further support for a probationary sentence in this case. Gall was a college student and drug user when he began making a lucrative income by distributing ectasy. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586 (2007). Although netting some $30,000 and distributing more than 2,500 grams of ecstasy over seven months, Gall abruptly stopped using, and then selling, ecstasy. Thereafter, he graduated from college, got a job, and stayed clean. *Gall*, 128 S.Ct. at 592. In the words of the sentencing judge, he "self-rehabilitated." Some four years after his withdrawal from the conspiracy, his checkered past found its way into his exemplary present life: he was charged with possession to distribute more than 2,500 grams of ecstasy. *Id.* With "no significant criminal history", and receiving a reduction of acceptance of responsibility, his recommended sentencing range was 30-37 months. *Id.* at 593.

PDF created with pdfFactory trial version www.pdffactory.com

The district court, however, found that the sentence provided by the guidelines was ill-suited to Gall and his crimes and instead sentenced him to probation for a term of 36 months.  The court relied on Gall's voluntary withdrawal from the conspiracy, his post-offense conduct, the support of his family and friends, lack of criminal history, and his age at the time of the offense in arriving at a sentence that addressed and properly balanced the sentencing factors as set forth under 18 U.S.C. § 3553.  *Id.* at 593.  The government appealed and the district court's decision regarding the appropriate sentence was affirmed in all regards.

*Shy* and *Gall* provide significant support for the probationary sentence sought by Ms. Esse.  Like Gall, Ms. Esse's refusal to continue to send payments at the direction of her husband to support al-Shabaab was not motivated by a desire to please this Court or to improve the sentence that she might receive on the offhand chance she might be charged with a crime.  It was motivated by a sincere belief that al-Shabaab's actions were wrong, and by a sincere desire to break free from her husband and others who were supporting al-Shabaab so that she could make a better life for her and her children.  While withdrawing from the conspiracy was the right thing to do, it still took a considerable amount of courage on the part of Ms. Esse.  Not only did she risk the wrath of her abusive husband, but she also lost the only financial support she had for her and her children.  Despite these obstacles, Ms. Esse knew what she did in supporting al-Shabaab was wrong, and she wanted to end her involvement in the conspiracy and end her relationship with her husband.  She knew that was the right thing for her to do, and she did it.  The seeds of Ms. Esse's change of heart were sown long before the dark

13

PDF created with pdfFactory trial version www.pdffactory.com

shadow of criminal charges was on the horizon. Ms. Esse, like Mr. Gall, "self-rehabilitated."

### III. MS. ESSE'S PROMPT, EXTENSIVE AND SUBSTANTIAL ASSISTANCE TO THE GOVERNMENT SUPPORTS A SENTENCE OF PROBATION.

Ms. Esse's substantial assistance to the government has been extensive spanning over two years. Ms. Esse began her cooperation and assistance to the government on October 3, 2014, only 2 months after counsel was appointed, and that cooperation and assistance continues today. Ms. Esse's cooperation was truthful, complete and substantial from the outset as to her involvement and the involvement of others in the conspiracy. She testified for the government for over 6 hours over two days against two of her co-conspirators in their trial in the Eastern District of Virginia, which resulted in convictions. Also, on information and belief, Ms. Esse has met with Minnesota FBI agents approximately 60 additional times to date to assist in ongoing investigations. It is expected that the government will provide an extensive rendition of Ms. Esse's cooperation in a letter to the Court, which may be supplemented by Ms. Esse. Ms. Esse's cooperation with and assistance to the government is not only substantial, it is extensive, complete and extraordinary.

Ms. Esse's extensive substantial assistance to the government is not only relevant for purposes of a motion for downward departure, pursuant to U.S.S.G. 5k1.1, but also goes to the issue of whether Ms. Esse is a risk to reoffend. The fact that she in a very short period of time met with the government on numerous occasions, provided complete and truthful information from the outset, agreed to plead guilty to an information, has

PDF created with pdfFactory trial version www.pdffactory.com

been released on a unsecured bond since her guilty plea in November of 2014 and has had no violations of her release conditions, indicate that Ms. Esse is unlikely to reoffend, and is a good candidate for probation. In addition, since her plea of guilty, Ms. Esse has obtained full-time employment as a PCA, making $11.75 an hour working 42 hours a week to support herself and her 3 children, and to become a productive member of society. Her efforts in assisting the government, readily and quickly admitting her involvement in the offense by her guilty plea, her proffers with the government, her public testimony in the trial of her co-conspirators in the Eastern District of Virginia, and her subsequent conduct after she pled guilty, are the best indicators of Ms. Esse's rehabilitation.

Courts have not been hesitant to credit a defendant's efforts at rehabilitation favorably in a §3553 analysis. *See United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008)(noting that the potential for rehabilitation may provide "grist for the sentencing court's mill"). It has been consistently recognized that acceptance of responsibility and rehabilitative efforts bear directly on the likelihood of recidivating. The court in *United States v. Lupton* observed that one who faces up to her conduct and takes the first steps to better her behavior in the future is deserving of less punishment because such actions directly reflect on the likelihood of recidivism. *United States v. Lupton*, 2009 WL 1886007, 1 *11 (D. Wis.).

Ms. Esse acknowledges that her criminal acts in sending 6 payments totaling $850 over a four month period to al-Shabaab at the direction of her husband is a serious crime. She should have refused to send the money. However, Ms. Esse respectfully suggests

PDF created with pdfFactory trial version www.pdffactory.com

that when her criminal acts are balanced against her subsequent actions in voluntarily withdrawing from the conspiracy well before she knew of the government investigation, and in her actions taken after the FBI showed up at her door, a sentence of probation is a sentence that is sufficient, but not greater than necessary to accomplish the purposes of sentencing set out in 18 U.S.C. § 3553(a).

IV.  **A SENTENCE OF 3 YEARS OF PROBATION IS APPROPRIATE IN LIGHT OF THE PROBATIONARY SENTENCE THIS COURT GAVE TO DEFENDANT SAYNAB ABDIRASHID HUSSEIN IN 2014.**

In May of 2014, this Court sentenced Saynab Abdirashid Hussein to 3 years of probation for her conviction on one perjury count of lying to a grand jury regarding whether she knew anyone who was raising money for any individuals who traveled from Minnesota to Somalia to fight against Ethiopian troops who had entered Somalia to support the Transitional Federal Government of Somalia. *See, United States v. Saynab Abdirashid Hussein*, Criminal No. 13-222 (MJD). In the factual basis for the plea, Ms. Hussein admitted that her testimony to the grand jury was false because she was asked to provide money to send fighters from Minnesota to Somalia, and she personally participated with others in fundraising to send fighters from Minnesota to Somalia.

While Ms. Hussein's crime of conviction was perjury carrying a maximum sentence of 5 years in prison not material support to a terrorist organization, the underlying facts supporting the plea were that Ms. Hussein helped others in fund raising to send actual fighters from Minnesota to Somalia to fight against the Ethiopian troops who were supporting the Transitional Federal Government of Somalia. In addition, Ms. Hussein lied to the grand jury and in her initial proffer sessions with the government

16

PDF created with pdfFactory trial version www.pdffactory.com

about her knowledge and involvement in the fund raising activities intended to send fighters from Minnesota to Somalia.

In this case, Ms. Esse pled guilty to providing material support to the terrorist organization al-Shabaab, which carries a maximum sentence of 15 years in prison. The underlying facts supporting Ms. Esse's conviction, providing a total of $850 in 6 payments over a 4 month period at the direction of her husband, does not justify a prison sentence, when compared against the probationary sentence given to Ms. Hussein for several reasons.

First, Ms. Esse voluntarily withdrew from the conspiracy and refused to send more money to support al-Shabaab, risking the wrath of her co-conspirators and her abusive husband, well-before Ms. Esse knew of the government investigation. In addition, Ms. Esse quickly cooperated with the government at the outset, providing truthful and complete information about her involvement and involvement of others. She did not lie or withhold information, unlike Ms. Hussein. Moreover, the assistance Ms. Esse provided to the government was substantial and extraordinary. Ms. Esse not only provided substantial and useful information regarding her co-conspirators, she also testified for the government in their trial in the Eastern District of Virginia for over 6 hours over a two day period. Her testimony was consistent and complete, and helped the government obtain convictions of both defendants who went to trial. But Ms. Esse did not stop there. She also met with Minnesota based FBI agents for many more hours helping the government in ongoing investigations. This extraordinary substantial

PDF created with pdfFactory trial version www.pdffactory.com

assistance on the part of Ms. Esse distinguishes her case from Ms. Hussein's case, and supports a sentence of 3 years of probation.

## V.  MS. ESSE'S FAMILY RESPONSIBILITIES SUPPORT A SENTENCE OF THREE YEARS OF PROBATION

Ms. Esse has three children, ages 18, 10 and 3. Ms. Esse has been the sole caretaker of all three of her children since birth. None of their fathers are involved in their lives. If Ms. Esse is sentenced to a prison sentence, there is no family member who could take the 10 and 3 year old, other than Ms. Esse's 18 year old daughter. While her 18 year old daughter may be able to take care of herself, she is a senior in high school and would not be able to care for her 10 year old brother and 3 year old sister, either financially or in the day -to -day care of the children. It would also not be fair to put her in the position of caretaker for her two siblings, just as she is thinking of starting college and making a future for herself. The father of Ms. Esse's 3 year old son, Mr. Ali, has never shown any interest in his son. Maybe more importantly, Mr. Ali is an al-Shabaab supporter, who was abusive to Ms. Esse, was the person who gave her the money to give to al-Shabaab, and instructed her to send the payments. Even if Mr. Ali would take custody of Ms. Esse's son, it would not be advisable for this 3 year old child to be under the influence of Mr. Ali.

Courts have recognized that the responsibilities of a parent can be a consideration in crafting an appropriate sentence under 18 U.S.C. §3553 (a). For example, in *United States v. Lehmann*, the Eighth Circuit approved a variance based on the §3553 factors for a mother of a nine-year-old boy who suffered from various psychological problems

PDF created with pdfFactory trial version www.pdffactory.com

page19

including attention deficit hyperactivity disorder, post-traumatic stress disorder, Asperger's disorder and other psychological problems. *United States v. Lehman*, 513 F.3d 805, 807 (8th Cir. 2008). Based primarily upon the harm that could befall Lehmann's son without the continuity of care provided by his mother, the court sentenced Lehmann to a sentence of five years of probation with six months of community confinement instead of the 37-46 months called for by the sentencing guidelines. *Lehmann*, 513 F.3d at 807-808. This sentence was affirmed by the Eighth Circuit Court of Appeals who noted in relevant part that *Gall* specifically contemplated that a non-guideline sentence might be appropriate when compelling family circumstances are present. *Id.* at 809, *citing Gall*, 128 S.Ct. at 602.

Ms. Esse's family responsibilities, the facts underlying the offense, the fact that Ms. Esse voluntarily withdrew from the conspiracy prior to her knowledge of the government investigation, her quick plea of guilty, her extraordinary and continuing substantial assistance to the government, and her conduct since she pled guilty all combine to justify a sentence of 3 years of probation.

## CONCLUSION

Ms. Esse knows that what she did was wrong and criminal, but she began to change her life before she knew that the government was investigating her actions. She withdrew from the conspiracy, and concentrated on making a better life for her and her children. When confronted with her criminal actions, she readily admitted her involvement, and gave complete and truthful information to the government. She testified against two of her co-conspirators in their trial in the Eastern District of Virginia,

19

PDF created with pdfFactory trial version www.pdffactory.com

which resulted in convictions, and assisted the government in additional investigations. Since her plea of guilty in November of 2014, Ms. Esse has complied with all the terms of her release, obtained full-time employment, and has concentrated on raising her children. She has done everything she could to make amends for her actions.

"Seek wisdom to temper justice with compassion" is a phrase accompanying a sculpture of the Angel of Mercy speaking to Lady Justice at Cumberland School of Law in Birmingham, Alabama. Ms. Esse respectfully requests that this Court do just that: exercise justice tempered with mercy. If the Court gives Ms. Esse a first second chance, she will not disappoint the Court. She is committed to continuing on the path of redemption.

For the foregoing reasons and those to be set forth in argument at sentencing, Ms. Esse asks this Court to sentence her to three years of probation.

Dated:  February 13, 2017                          Respectfully submitted,

                                                   **SICOLI LAW, LTD.**


                                                   By:  Robert D. Sicoli_____
                                                        Robert D. Sicoli
                                                   Attorneys for Defendant
                                                   333 South Seventh Street, Suite 2350
                                                   Minneapolis, MN 55402
                                                   Telephone:  (612) 871-0708
                                                   Reg. No. 178238

PDF created with pdfFactory trial version www.pdffactory.com