UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 14-369 (MJD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S POSITION |
| v. | ) | WITH RESPECT TO SENTENCING |
| | ) | AND MOTION FOR DOWNWARD |
| AMINA MOHAMUD ESSE, | ) | DEPARTURE |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorney Charles J. Kovats, Jr., hereby submits its position with respect to sentencing of Defendant Amina Mohamud Esse ("Esse" or "defendant") and motion pursuant to U.S. Sentencing Guidelines (U.S.S.G.) § 5K.1.1.   The government respectfully requests the Court grant the government's motion and sentence the defendant to a five-year period of probation.

I.     THE CASE AGAINST THE DEFENDANT

A.     The Charge of Conviction

On November 20, 2014, defendant Esse pleaded guilty to a single-count information charging her with Conspiracy to Provide Material Support to a Foreign Terrorist Organization, al Shabaab, in violation of 18 U.S.C. § 2339B.   This offense carries a statutory maximum sentence of 15 years' imprisonment, a maximum term of supervised release of life, a $250,000 fine, and a $100 special assessment.

**B.     The Defendant's Offense Conduct**

*1.     The Factual Basis in the Plea Agreement*

The parties stipulated in the plea agreement to the following facts:

Between on or about January l, 2011, and July l, 2012, the defendant became aware of a group of women in both the United States and outside the United States (hereinafter, "the co-conspirators") who desired to provide material support to al Shabaab. The defendant met and joined this group of women through an on-line service that provides private chat rooms for users. The defendant participated in private chat sessions on a regular, if not daily, basis while a member of the conspiracy.   During this time, the defendant listened to lectures and participated in discussions with members of the conspiracy that were almost uniformly pro-al Shabaab.   For example, Sheikh Hassan Hussein, a Nairobi, Kenya-based pro-al Shabaab cleric targeted for sanctions by both the United States and the United Nations, often lectured to the defendant and her co-conspirators.

Beginning in December 2011 and continuing to April 2012, the defendant provided more than $500.00 — divided between several transactions over a period of months — to Nairobi-based co-conspirator Fardowsa Jama Mohamed ("Mohamed"), at the direction of Virgina-based co-conspirator Muna Osman Jama ("Jama"). The defendant delivered this money to co-conspirator Mohamed knowing it would be used to support al Shabaab. Moreover, at the time the defendant provided this money, the defendant knew that al

Shabaab had been designated as a foreign terrorist organization by the United States Department of State.

The defendant terminated her relationship with co-conspirators Mohamed and Jama prior to her knowledge of the existence of the government's investigation into her misconduct.

### 2.   The Scope of the Defendant's Role in the Conspiracy

As described in the plea agreement, the defendant provided "more than $500" to her conspirators, Fardowsa Jama Mohamed and Muna Osman Jama, in order to support the terrorist organization, al Shabaab.  As the government's investigation has revealed, the defendant ultimately provided $850 between December 2011 and April 2012 to the leaders of her group knowing that it would be delivered to al Shabaab.  This group of women, which numbered approximately 15, sought from its members monthly contributions of $100 to support al Shabaab – but also raised larger amounts for particular items.  For example, the group raised approximately $5000 for the purchase of an x-ray machine to treat wounded al Shabaab fighters.

### 3.   The Defendant's Previous Statement

During the course of the investigation, agents of the FBI executed a search warrant at the residence of the defendant.  At the time of the search (on or about July 22, 2014), the defendant was interviewed by agents of the FBI and provided a statement that was false in all material aspects.  At the time the defendant made this statement, she had not yet obtained counsel or agreed to cooperate.

### C.     The Pertinent Guideline Calculations Agreed to by the Parties

In the plea agreement, the parties agreed to the following Guideline calculations:

Base Offense Level, § 2M5.3(a):                    26     (Plea Agreement, para. 6(a))

Acceptance of responsibility, §§ 3E1.1(a), (b):  -3     (*Id.* para. 6(d))

Felony involving crime of terrorism § 3A1.4(a): +12   (*Id.* para. 6(c))

The government reserved the right to argue that a two-level increase in offense level under § 2M5.3(b)(1)(D) is appropriate because the defendant's conduct met the standard for "Providing Money for Commission of Violent Act."   (*Id.* para. 6(b)).   The defendant reserved the right to argue that a two-level downward adjustment under § 3B1.2(b) applies because the defendant played a "minor role" in the offense.   As shown below, the PSR recommends the application of both these disputed adjustments.

## II.     THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On or about February 10, 2017, the United States Probation Office disclosed the Final Revised PSR in this case. The PSR calculates defendant's applicable guideline range at 180 months' imprisonment, based on a total offense level of 35, criminal history category of VI, and a statutory maximum sentence of 15 years' imprisonment.   (PSR ¶ 73).

The PSR guideline calculations are summarized as follows:

**Base Offense Level, § 2M5.3.1:**                          26     (PSR ¶ 21)

**Specific Offense Characteristics:**
Providing money for commission of violent act, § 2M5.3(b)(1)(D):   +2     (PSR ¶ 22)

**Victim Related Adjustments:**
Felony involving/promoting crime of terrorism, § 3A1.4(a):   +12     (PSR ¶ 23)

4

| | | |
|---|---|---|
| Minor role, § 3B1.2(b): | -2 | (PSR ¶ 24) |
| Acceptance of responsibility, §§ 3E1.1(a), (b): | -3 | (PSR ¶¶ 28, 29) |
| **Total Offense Level:** | 35 | (PSR ¶ 30) |
| Criminal History Category: | VI | (PSR ¶ 37) |
| Guideline Range: | 180 months | (PSR ¶ 73) |
| Supervised Release: | Any term up to life | (PSR ¶ 76) |
| Probation: | One to five years | (PSR ¶ 78) |
| Fine: | $20,000-$200,000 | (PSR ¶ 82) |

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

## III.   GOVERNMENT'S RESPONSE TO THE PSR.

The government has no objection to the PSR and concurs with the guideline calculations in the PSR. The government does not believe any other Specific Offense Characteristics or Victim-Related Adjustments are appropriate. The government also concurs that the appropriate guideline range is 180 months' imprisonment based on a Total Offense Level of 35 and a Criminal History Category of VI.[1]

---

[1] Because the government is recommending a probationary sentence for this defendant, the government is not asking the Court to determine the scope of the defendant's role in the offense. In the abstract, the government does not believe that a defendant who conspires with others to provide financial support – on a long-term, monthly basis – to a terrorist group could be considered a "minor participant" in the offense. However, the government does believe this issue needs to be resolved herein and is not objecting to the USPO's application of the 2-level reduction for "minor role" for this defendant.

## IV.   THE GOVERNMENT'S MOTION UNDER U.S.S.G. § 5K1.1

As the Court is aware, the defendant entered her plea of guilty before the Court on November 20, 2014, in a sealed proceeding, pursuant to a cooperation agreement with the United States.   However, even before the agreement was tendered to the Court, the defendant had already begun providing substantial assistance to the United States.

U.S.S.G. § 5K1.1 provides five factors the Court should consider when evaluating the defendant's assistance and determining the appropriate reduction in sentence.   *See* U.S.S.G. § 5K1.1(a).   The government's assessment of these factors follows:

### A.   The Government's Evaluation of the Assistance Rendered

The defendant's substantial assistance rendered to the government is best described in three categories: (1) providing information about her role in the offense, the role of her conspirators, and the means by which they committed their offense; (2) providing testimony in the trial of *United States v. Muna Jama, et al., 14-CR-230 (AJT)*, held in the Eastern District of Virginia in July 2016; and (3) providing information to the FBI about other individuals of investigative interest.

#### 1.   *Information Provided about the Defendant's Role in the Offense, Her Conspirators' Roles, and the Offense Itself*

Prior to her guilty plea, Ms. Esse met with the United States on five occasions between October 3, 2014 and November 20, 2014.   During these meetings, Ms. Esse extensively detailed to the FBI the objectives of the conspiracy she joined.   She described the manner in which the group sent money to Kenya and Somalia in order to support al-Shabaab.   She identified her role in the conspiracy and described her co-conspirators (none

6

of whom she had personally met) and their respective roles.   She provided detailed descriptions to investigators about the notebooks and other evidence seized from her residence, emails and other communications exchanged with her conspirators, as well as the tactics employed by the group to evade detection by law enforcement.

### 2.    *Trial Testimony Provided in the Muna Jama, et al. Matter*

Ms. Esse testified over two days in the *Muna Jama, et al.* trial held in the Eastern District of Virginia ("EDVA").   By all accounts, her testimony was truthful, complete, and compelling.   As the only member of the conspiracy to cooperate and testify, her testimony was also uniquely valuable.   Indeed, through Ms. Esse, the United States was able to admit as evidence her own notebooks in which she had recorded (1) the usernames and telephone numbers of her co-conspirators and (2) the amounts of money each contributed.   Ms. Esse was also able to identify her own voice on certain voice recordings played during trial and, more importantly, identify code words used by the conspirators to avoid detection.   These code words masked the unlawful recipient of and purpose for the money sent. Recognizing the persuasive nature of her testimony, defense counsel cross-examined Ms. Esse extensively.   Notwithstanding the game efforts of defense counsel, the jury found both defendants guilty of the charged offenses.

Leading up to trial, Ms. Esse met with prosecutors from EDVA to prepare her testimony on several occasions (approximately 8) for multiple hours each time.   These preparation sessions were painstakingly detailed and involved listening to many hours of recorded conversations.

### 3. *Information Provided About Other Matters of Investigative Interest*

Throughout the term of her cooperation, the defendant met with FBI agents on dozens of occasions to discuss matters of interest. Many of these "meetings" related to matters of a time-sensitive nature and were conducted by phone. In total, the FBI met with the defendant about a specific item of interest on approximately 57 occasions - both in person and via telephone.

### B. Truthfulness, Completeness, and Reliability of Ms. Esse's Information

As stated above, the defendant's first statement to the FBI – made when the FBI executed a search warrant at her house – was not honest. Since acquiring counsel and agreeing to cooperate with the United States, her information has been persistently truthful and complete. Further, it must be said that this defendant is nearly uniquely situated in this regard: unlike many others in her situation, no information provided by the defendant has been found to be false or mistaken since she agreed to cooperate.

### C. Nature and Extent of the Defendant's Cooperation

The defendant agreed to all of the demands placed upon her by the United States, culminating in her testimony in the *Muna Jama, et al.* trial this past July. At trial, the defendant convincingly described how she came to be recruited to join this conspiracy, including the use of the internet and PalTalk (a phone-based chat room); the impact of propaganda on her; her agreement to send money – of which she had very little; the actions of her co-conspirators; and the mechanics of the day-to-day operation of the criminal

enterprise.   Provided over two days, Ms. Esse's information was detailed, voluminous, and truthful.

### D.      Injury Suffered, or Danger or Risk of Injury to the Defendant

Perhaps unsurprisingly, the defendant's cooperation has been the subject of discussion within the Somali community – even if her testimony occurred more than 1000 miles away.   Since July 2016, when her guilty plea was unsealed and her cooperation made public, the defendant has been shunned both by her family and some segments of the broader Somali community because of her cooperation.

### E.      Timeliness of the Defendant's Assistance

The defendant's assistance was timely.   During her first interview with the FBI, Ms. Esse (with her counsel) immediately began providing substantial assistance to the United States.

## V.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a).

In *Gall v. United States* the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine a sentence sufficient, but no greater than necessary, to achieve the goals of 18 U.S.C. § 3553.   552 U.S. at 38, 49-50 (2007); *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally

decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Gall*, 552 *U.S.* at 50. If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A.    Nature and Circumstances of the Offense.

As described in the plea agreement and PSR, the defendant provided material support to the foreign terrorist organization al Shabaab when she delivered money repeatedly to her co-conspirators knowing that money was destined for, and received by, al Shabaab. The defendant did so knowing that al Shabaab had been designated as terrorist organization by the United States and her contributions to al Shabaab were unlawful. However, at the time she made these contributions, Ms. Esse was convinced that supporting al Shabaab was not only justifiable, but also an obligation. During the period that encompassed the defendant's criminal conduct, she participated in dozens of discussions

with others about al Shabaab's activities, the success or failure of various al Shabaab violent attacks and operations, the success or failure of Somali government and AMISOM actions in Somalia, and the status of affairs in Somalia regarding the Somali government. The defendant was well-versed about al Shabaab and their operations in Somalia.   At the time, she believed in them.

### B.      History and Characteristics of Defendant.

As stated above, the defendant was born in Kismayo, Somalia, but left Somalia in the face of many personal challenges when a young adult.   (PSR ¶¶ 40-43).   Like many who were forced from Somalia, she lived in a refugee camp before coming the United States.   (PSR ¶ 43).   In her case, Ms. Esse lived in a camp in Botswana from 1999 until 2008.   (Id.)   In 2009, she finally arrived in the United States.   (Id.)   Since arriving in the United States, the defendant has endeavored to maintain steady employment while raising her three children.   (PSR ¶¶ 46, 48, 49, 61-67).   The defendant has no criminal history before the instant offense.   (PSR ¶¶ 35-37).

In mitigation and to her great credit, after being approached by the FBI following the search conducted at her residence, the defendant obtained counsel and immediately agreed to cooperate with the government's investigation.   The defendant also agreed to plead guilty in a sealed courtroom in order to provide the maximum opportunity for the government to leverage her cooperation against other members of al Shabaab.   As stated below, her cooperation was both extensive and productive.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The defendant committed extremely serious crimes when she knowingly conspired to provide material support to al Shabaab.  Considering the seriousness of this crime, promoting respect for the law and providing just punishment are important factors in this case.  As the Supreme Court has recognized, "combating terrorism is an urgent objective of the highest order." *Holder v. Humanitarian Law Project*, 130 S.Ct. 2705, 2724 (2010).

Sophisticated terrorist plots, such as those used by al Shabaab to both sustain itself and commit acts of terror, require multiple participants performing different roles.  The fact that defendant played a supporting role does not make her crime any less serious or unimportant.  Indeed, when enacting § 2339B as a distinct criminal offense, Congress made specific findings regarding the serious threat posed by international terrorism and the networks that provide support to those who commit acts of terrorism.  Congress determined, and the Supreme Court has recognized, that terrorist organizations, such as al Shabaab, "are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Id.* (quoting AEDPA §§ 301(a)(1)-(7), 110 Stat. 1247). The Supreme Court further explained that enforcing § 2339B "furthers this international effort [to combat terrorism] by prohibiting aid for foreign terrorist groups that harm the United States' partners abroad." *Id.* at 2726.

Further, although the defendant has no appreciable criminal history and this offense represents her first criminal conviction, her participation in this criminal conspiracy cannot

be viewed as a discrete event occurring at a singular place and time.   Far from doing a favor for a friend on a single instance, the defendant repeatedly took steps to provide material support, on a consistent basis, to a terrorist organization.

The government respectfully submits that the Court consider the seriousness of defendant's support to al Shabaab, which has committed numerous acts of terrorism against the government of Somalia, its citizens, and those who have sought to provide relief and comfort to its citizens, including the United Nations and the African Union.   Absent the defendant's substantial assistance, a long term of imprisonment would otherwise be necessary to reflect the seriousness of defendant's violation of § 2339B and to promote respect for the law.

### D.   The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

General deterrence is the public response necessary to deter other people from committing similar crimes.   "Congress specifically made general deterrence an appropriate consideration   . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Terrorists and terrorist organizations rely upon support from individuals for their success in carrying out specific attacks, as well as their continued existence.   The sentence imposed in this case needs to disabuse individuals from believing that they can sit at a safe distance, lend support to the violent aims of terrorists and terrorist organizations, and be

free from detection or punishment.   In the District and State of Minnesota, which has seen a proliferation of cases involving young men traveling to join terrorist organizations, this is no small interest.   To date, the prosecution of the men who have joined, or attempted to join, al Shabaab and ISIL (as well as those who support them) has not completely stemmed the flow of support to the foreign terrorist organization from Minnesota.

In the case of defendant Esse, however, general deterrence takes on a different meaning.   Ms. Esse chose to assist the United States, and therefore was the object of the ire of some people, not the object of their support.   A significant sentence imposed on defendant Esse could serve to deter others from choosing to assist the United States.   In the government's view, this interest is paramount and serves – in large measure – to inform the government's recommendation for probation here.   Finally, the government sees little, if any, need for individual deterrence here as Ms. Esse has – even prior to her arrest – convincingly rejected al Shabaab.

### E.    The Kinds of Sentences Available, the Need to Avoid Disparities and the Sentencing Guidelines and Related Policy Statements.

Within the last four years, approximately 20 defendants have been sentenced in federal district court for providing, or attempting to provide, material support to terrorist organizations, or related offenses.   At least one defendant has been sentenced to probation, while others have received lengthy prison sentences.

Within the cases that have been before this Court for sentencing, the government believes the Court should note the following facts that could serve to distinguish this defendant from some of the other defendants, (1) the defendant did not travel to Somalia

14

to join a terrorist group or attempt to do so; (2) the defendant did not have a leadership role in the offense; (3) the defendant pleaded guilty well before trial; (4) the defendant has been a good performer while on supervised release; and (5) the defendant cooperated fully and nearly immediately with the United States.[2]

## VI.    CONCLUSION

The Guideline sentencing range for the offense to which the defendant pleaded guilty is 180 months' imprisonment.   Based on the application of the 18 U.S.C. § 3553(a) factors, consideration of the defendant's substantial assistance, and her good performance while on release, the government believes that a five-year term of probation is an appropriate sentence.

Dated: February 13, 2017                    Respectfully Submitted,

                                            ANDREW M. LUGER
                                            United States Attorney


                                            *s/ Charles J. Kovats, Jr.*
                                            CHARLES J. KOVATS, JR.
                                            Assistant United States Attorney

---

[2] The government also notes here that defendants Amina Ali and Hawo Hassan, who also provided financial support to al Shabaab, had links to the uppermost echelons of al Shabaab.   This defendant's connections to al Shabaab were decidedly less notable.

15